IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BRYAN CLARK, §
§
Plaintiff, §
§
V. § CIVIL ACTION NO. H-12-2096
§
CAROLYN W. COLVIN, ACTING §
COMMISSIONER OF THE SOCIAL §
SECURITY ADMINISTRATION,[1] §
§
Defendant. §

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT AND GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[2] in this social security appeal is Plaintiff's Motion for Summary

Judgment and Memorandum in Support thereof (Document No. 11), Defendant's Response to

Plaintiff's Motion for Summary Judgment (Document No. 12), Defendant's Motion for Summary

Judgment and Memorandum in Support thereof (Document No.10) and Plaintiff's Response to

Defendant's Motion for Summary Judgment (Document No. 13). After considering the cross motions

for summary judgment, the administrative record, and the applicable law, the Magistrate Judge

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted for Michael J. Astrue as the defendant in this action.

[2] The parties consented to proceed before the undersigned Magistrate Judge on January 10, 2013.  (Document No. 7).

ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 10) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 11) is DENIED, and the decision of the Commissioner is AFFIRMED.

## I. Introduction

Plaintiff, Bryan Clark, ("Clark") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his applications for disability benefits and supplement security income ("SSI"). Clark argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, John D. Sullivan, committed errors of law when he found that Clark was not disabled. Clark argues that he has been disabled since January 1, 2001, due to schizophrenia, bipolar disorder, post traumatic stress disorder ("PTSD"), and depression. In a disability report that Clark completed near the time he filed for benefits, he stated he could not work because "I get really nervous in the work place. I have a hard time concentrating on one task at a time. I have bad visions of my stepfather at work and I cannot stay because I get so nervous." (Tr. 138). In a function report completed the same time, Clark identified difficulty with memory, completing tasks, concentration, understanding, following instructions, and getting along with others as his primary problems that preclude him from working. (Tr. 150). According to Clark, the ALJ's determination is not supported by substantial evidence. He argues the ALJ erred by not relying on Dr. Hirsch's evaluation along with his consistently low Global Assessment Functioning ("GAF") scores which show he could not maintain and sustain full time competitive employment. Clark further argues the ALJ should have obtained the services of a medical expert. Clark also argues the ALJ erred by failing to discuss the letter submitted by his daily care giver that corroborated his allegations. In addition, Clark argues the ALJ failed to discuss the strong medications he has been

prescribed to treat his mental impairments and the side effects from the medications such as drowsiness.  Lastly, Clark argues the ALJ erred by failing to include in the hypothetical question posed to the Vocational Expert additional nonexertional limitations such as hallucinations, reclusiveness and medication side effects. Clark seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding his claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Clark was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II. Administrative Proceedings

On April 16, 2009, Clark protectively filed for supplemental security income ("SSI") and for disability insurance benefits ("DIB") on April 27, 2009, claiming in both applications that he has been disabled since January 1, 2001, due to bipolar disorder, schizophrenia, and post traumatic stress disorder. (Tr. 108-117). The Social Security Administration denied his applications at the initial and reconsideration stages.  (Tr. 51-58, 65-70).   Clark then requested a hearing before an ALJ.  (Tr. 71-72).   The Social Security Administration granted his request, and the ALJ held a hearing on September 28, 2011.  (Tr.21-44). On October 28, 2011, the ALJ issued his decision finding Clark not disabled. (Tr. 8-15).

Clark sought review by the Appeals Council of the ALJ's adverse decision.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest; or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. The Appeals Council,

on May 3, 2012, concluded that there was no basis upon which to grant Clark's request for review. (Tr.1-4). Clark  has timely filed his appeal of the ALJ's decision.  The Commissioner has filed a Motion for Summary Judgment (Document No. 10), to which Plaintiff filed a Response. (Document No. 13).  Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 11), to which Defendant has filed a Response.  (Document No. 12).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 496.  (Document No. 4).  There is no dispute as to the facts contained therein.


**III.  Standard for Review of Agency Decision**

The court, in its review of a denial of disability benefits,  is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.*  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not reweigh  the evidence in the record nor try the issues *de novo*, nor substitute its judgment for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are

for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C.  § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one

is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in *any* substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)) (emphasis in original).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.  If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5.  If  the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Anthony,*  954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.  *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 564.

In the instant action, the ALJ determined, in his October 28, 2011, decision, that Clark was not disabled because he had the RFC to perform light work subject to certain restrictions.  In particular, the ALJ determined that Clark had not engaged in substantial gainful activity since

January 1, 2001, (step one); that Clark's major depressive disorder, generalized anxiety disorder, schizoaffective disorder bipolar type, and polysubstance abuse were severe impairments (step two) but the above impairments either singly or in combination did not meet or equal a listed impairment in Appendix 1 of the regulations (step three); based on the medical records, and the testimony of Clark, Clark had the residual functional capacity ("RFC") to perform light work subject to certain restrictions. Clark could perform a full range of work at any exertional level. As for nonexertional limitations, he could carry out simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes. He was limited to occasional interaction with supervisors, co-workers and the public. The ALJ found that Clark could not perform his past relevant work (step four). The ALJ further found that based on Clark's RFC, his age, education and the testimony of a vocational expert, that Clark could perform work as an office cleaner, a parking lot attendant, and a mail clerk (non postal) and was not disabled within the meaning of the Act (step five). As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V.  Discussion

The medical records reveal that Clark was born in 1984, and was sixteen years old on his alleged onset date of disability. On January 5, 1999, when Clark was 14 years old, he struck a concrete wall with his right hand and he was treated for a hand contusion.. (Tr. 211, 212).

Clark was admitted to Mainland Medical Center on July 17, 2002, for a medication overdose and hallucinations. Clark reported that he had wanted to get "high" for his 18th birthday. The treatment note revealed that Clark had been treated two months earlier for alcohol intoxication. (Tr. 345-353).

Clark was in a motor vehicle rollover accident on December 14, 2002. He was treated for back pain. (Tr. 203-208). Spine x-rays were normal. (Tr. 215-218). Clark sought refills of Vicodin and Flexeril that had been prescribed following the rollover accident on March 26, 2003. He complained of neck pain and muscle spasms. The medical note shows that Clark's range of motion was normal and his sensation was intact. (Tr. 200). On July 2, 2003, Clark went to the UTMB Outpatient Clinic Services seeking pain medication. The treatment note reveals that Clark's chart was reviewed by the Attending Physician and the doctor determined it was not medically necessary to see Clark for his pain complaints and declined to refill his pain prescriptions. (Tr. 199).

Clark threatened to kill himself on August 19, 2007. His girlfriend called the police and he was transported to the hospital. He was admitted to the hospital. He was hospitalized until August 22, 2007. (Tr. 226-243, 334-343). The intake record shows that Clark had two prior suicide attempts. Clark reported he had used cocaine three days before admission, had smoked marijuana that morning, and had been binge drinking. Clark's discharge diagnosis was major depressive disorder, recurrent episode, severe, with psychotic behavior. (Tr. 234). When admitted, Clark's GAF score was 35. On discharge it had improved significantly to a score of 47. (Tr. 227, 335, 337).

Clark was hospitalized for alcohol intoxication on March 2, 2008. (Tr. 197-198, 332-333). Even though he intentionally overdosed on alcohol, Clark called the paramedics when he started vomiting. He reported being upset about the deaths of two friends and his father within the past month so he intentionally overdosed on alcohol. (Tr. 260-268). His blood alcohol level was one and

a half times above the legal limit.

Clark hurt his back lifting and went to the Mainland Medical Center Emergency Room on April 25, 2008, complaining of pain. Clark denied drug use but admitted occasional alcohol consumption. **(**Tr. 379-385).

On May 28, 2008, Clark went to the walk in clinic. He stated he needed to be back on his medications. His prescriptions were refilled (Tr. 247, 396). He had a psychiatric follow up appointment on June 7, 2008, to check the efficacy of his medications that he had resumed taking. The treatment note states: "meds  have controlled him to the point that he can work again. Starts [Wednesday] at retail clothing store and is excited about it." (Tr. 246, 395).

Clark was seen at the Mainland Medical Center Emergency Room on July 18, 2008, for his complaints of left knee pain and leg pain. (Tr. 374-378).

Clark had a follow up mental health appointment at the Galveston County Coordinated Community Clinics on October 21, 2008. (Tr. 245, 357, 394).

Clark was admitted to the Mainland Medical Center on January 9, 2009. (Tr. 271-293, 346, 365-373). His girlfriend reported that Clark had an "episode" with multiple mood swings within a matter of minutes. Clark reported missing several doses of Trazadone. He was treated for cocaine abuse and alcohol intoxication. According to the treatment note, his multiple mood swings within minutes were explained by the results of his toxicology screening.  He was encouraged to quit drugs of abuse. (Tr. 286).

Clark was referred for an evaluation by Victor N. Hirsch, Ph.D, a licensed clinical psychologist. Dr. Hirsch conducted a mental status exam and clinical interview on June 25, 2009. (Tr. 296-301). Clark reported that the medications he was taking (Trazadone, Celexa and Buspar) helped "sometimes."  He denied taking recreational drugs. As for alcohol, Clark stated he drinks

occasionally and last had a drink three months ago.   (Tr. 297). The results of Dr. Hirsch's mental status/behavioral observations follow:

1. <u>Appearance and Self Care</u>:

<u>Grooming</u>: He arrived on time and he was casually dressed and he presented himself in a neat and well groomed appearance.

<u>Posture/Gait</u>: Normal

<u>Motor Activity</u>: Restless

<u>Eye-hand Coordination/Perceptual-Motor Coordination/Perceptual-Motor/Integration/Dysparxia/Construction Ability</u>: His eye hand coordination was within normal limits. He was able to pick up a coin with each hand. He is left-handed.

<u>Attitude & Behavior & Psychomotor</u>: He was cooperative and polite and he appeared to put forth his best effort.

2.<u>Sensorium</u>:

<u>Attention</u>: Poor-Distracted

<u>Concentration</u>: Anxiety interfered with his concentration. His persistence and pace appeared normal. He could count backwards from 20 to 1. He could only count up by serials of 3 to 6. He could not count backwards by serials of 7. He was not able to count backwards by 3's from 100 to 88. He was able to spell WORLD backwards.

<u>Sensorium and Orientation to Time, Place and Person</u>: He was oriented to the month and the year. He was not sure of the day. He knew the name of the city he was in and he knew the time of day. He knew the place.

3. <u>Relating</u>:

<u>Eye Contact</u>: Fleeting

4. <u>Affect and Mood</u>:

<u>Affect</u>: Labile

5. <u>Thought and Language</u>:

<u>Speech Flow & Stream of Mental Activity</u>: There was no poverty of speech,

looseness of association, blocked, slowed or tangential speech. There was some paucity in his speech flow.

6. Executive Functions:

Reality Testing: Somewhat distorted but appeared to be intact at times.

7. Stress:

Stressors: He reports that everything stresses him; money, housing, family conflict.

Coping Ability: Poor.

Special Preoccupations: He reports that he has attempted suicide many times with pain pills, walked in front of a car. He can't give a number of how many times he has attempted suicide. He reports some visual hallucinations in that he sees his stepfather who sexually abused him. He has auditory hallucinations and he hears voices all the time. The voices tell him to kill himself and that he is no good.

Memory: He knew his date of birthday but he did not know his Social Security number. He remembered 1 out of 3 objects after a 5 minute interval. He was able to do 4 digits forward and 3 digits backwards. In evaluating him for memory and associative learning from the Verbal Paired Associates I, taken from the Wechsler Memory Scale Form III, on Recall A, he remembered 0 out of 8. On Recall B, he remembered 1 out of 8. On Recall C, he remembered 1 out of 8. On Recall D, he remembered 1 out of 8. On Verbal Paired Associates II, after 20 minutes, he remembered 1 out of 8.

He reports some major problems with his memory. He loses everything and he forgets things easily. He has difficulty in recalling people's names. Others have said that his memory has gotten worse.

Recent Memory: When asked about his previous day's activities, he says that he really can't remember. He wore the same clothes today as he did yesterday.

Remote Memory: He did not know the name of his elementary or his middle school. He knew the name of his high school. He reports attending a lot of different schools and this is why he can't remember.

Fund of Information: He did not know his area code or telephone number. He did not know his address or zip code. He is 5 ft. 9 in. tall and he weights 220 pounds. He did not know his shoe size. His shirt size is large.

Information about People: He did not know that the President of the United States is President Obama or that the previous President was George Bush. He did not know

that Bill Clinton was the President before George H.W. Bush. He knew that Rick Perry is the Governor of Texas. He knew that the President lives in the White House in Washington, D.C. He thought that the first President of the United States was Abe Lincoln. He knew what a pharmacist does.

Information about Things: When asked to name 3 cities beginning with the letter D, he was able to name 3. He did not know how many ounces are in a pound. He knew the sun rises in the east and he knew that the capital of Texas is Austin.

Information about Events: When asked about a current event going on in the news that he has read about in the papers or on television, he was not able to relate any as he does not watch television.

Differences: He knew the difference between a midget and a child. He also knew the difference between an orange and a baseball.

Verbally Presented Arithmetic Problems: He was able to correctly answer how many quarters there are in $1.75. He was not able to answer how many nickels there were in a dollar: he thought there were 9.

Abstract Reasoning/Proverbs: He was able to get the proverbs, "you can't judge a book by its cover" and "don't cry over spilled milk" but he was not able to get the probers, "haste makes waste" and "strike while the iron is hot" or "make hay while the sun shines."

Social Judgment:  When asked what you should do if you find a purse or wallet in the street or on the sidewalk, he reports that you would turn it in. He said that people go to school to get a good job. He did not understand the concept of postage paying for the service with regard to letters that you mail. When asked what you should do if someone is critical of a job you have done, he would tell them to "screw off." He does have someone that he can talk to and confide in.

Decision Making:  He reports having a hard time in making decisions and sometimes he makes them too quickly and sometimes it takes him too long.

Insight into Disorder: He does not have insight as to why people take medication.

Estimate of Intelligence: His estimate of intelligence is low average.

8.  Functional Information and Adaptive Behavior:

Activities of Daily Living:  In his activities of daily living, he watches television and lies on the couch and he plays with the baby.

Caring for Personal Needs:  He can bathe and dress himself and he bathes daily.

Traveling:  He does not drive and he does not have a driver's license.

Preparing Meals: He does not fix food for himself.

Handling Finances: He occasionally will handle and exchange money.

Shopping for Groceries: He does not shop for groceries.

Watches TV-News: He does not watch the news on television.

Read Newspaper:  He does not read a newspaper.

Social Functioning: He does not go out with friends. He does not interact with family. He does not go to church. He may have some difficulty with people in the authority position.

Deterioration and Decomposition:  His overall condition is staying the same.

Prognosis: Prognosis for change or improvement is poor as it is a chronic condition. His ability to make occupational and personal decisions is poor.

Clark had a GAF score of 49. Based on his consultative evaluation, Dr. Hirsch opined:

Bryan A. Clark is a 25 year old Caucasian male. He appears to have depressive episodes and anxiety episodes. He reports hallucinations and previous diagnosis but these have not been verified but he appears to have some unusual thinking and thought patterns and some distortion with reality. He has suicidal thoughts and he reports past attempts. Should he qualify for disability, he is likely to need some assistance in managing it. (Tr. 301).

Margaret Meyer, M.D., ("Dr. Meyer") reviewed Clark's medical records and completed a

Psychiatric Review Technique on July 22, 2009 . (Tr. 302-315). Dr. Meyer found that none of

Clark's impairments "precisely satisfy the diagnostic criteria" for listings 12.04 (Affective Disorder),

and 12.06 (Anxiety Related Disorders). According to Dr. Meyer, Clark's medical record reflected

that he experienced: moderate restriction of activities of daily living, moderate difficulties in

maintaining social functioning and moderate difficulties in maintaining concentration, persistence,

or pace; and no episodes of decompensation. Dr. Meyer concluded that Clark's alleged limitations

were not fully supported by the record, in part because Clark was not a credible or believable source.

(Tr. 314). In addition to the Psychiatric Review Technique, Dr. Meyer completed a Mental Residual Functional Capacity Assessment. (Tr. 316-319). Dr. Meyer evaluated Clark in four areas: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Dr. Meyer found Clark moderately limited in the areas of understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work setting. Dr. Meyer found Clark was not significantly limited in the areas of remembering locations and work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances, sustaining an ordinary routine without supervision, making simple work-related decisions, asking simple questions or requesting assistance, maintaining socially appropriate behavior and adhering to basic standard of neatness and cleanliness, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places or using public transportation, and setting realistic goals or making plans independently of others. Overall, Dr. Meyer found that Clark could understand, remember, and carry out detailed but non-complex instructions, make important decisions, attend and concentrate for extended periods, interact with others, accept instructions and respond to changes in work settings. She noted again the severity of limitations that Clark claimed caused by his impairments

were not fully supported by the medical record. (Tr. 318)

The medical records further show that Clark injured his left thumb on August 13, 2009. (Tr. 322-329).  An X-ray taken of his left hand was normal. (Tr. 329).

Clark had routine follow up appointments at the Galveston Coordinated Community Clinic on October 26, 2009, and November 9, 2009, for medication refills.  (Tr. 355, 392). He left a message that he needed refills on November 12. Clark was contacted by the Clinic and instructed about the medication he was to take daily and since his prescription had been filled days before, no refills were ordered. (Tr. 391). He called the next day for refills. Again, Clark was reminded of his upcoming appointment on November 23, 2009. (Tr. 391). Clark was a no show for his November 23, 2009, appointment. A friend of Clark's called the Clinic on December 7, 2009, attempting to get refills of Clark's medications.(Tr. 390).

In October 2008, Clark reported that his behavior and symptoms improved when taking his medications consistently.  (Tr. 362-363, 452). Clark elaborated that without his medication, he is "constantly depressed" and has "thoughts of suicide." (Tr. 448-462, 468-469, 473-476, 478-480). Clark denied any problem with drugs or alcohol. (Tr. 453, 454). He had a GAF score of 43. (Tr. 468, 476).  At Clark's next appointment on October 26, 2010, he acknowledged that he had not been taking his medication. His toxicology screen was positive for cannabis.  (Tr. 483-484). He had a GAF score of 43. (Id).

Clark was next seen on January 6, 2011. He reported being compliant with his medications. (Tr. 464, 471, 472, 474, 485). He had a GAF sore of 43. (Tr. 471). Notes from his February 9, 2011, session, reveal that Clark's medications were refilled on February 9, 2011.He had a GAF score of 43. (Tr. 465, 477, 488).   The treatment note dated  March 9, 2011 shows Clark reported his hallucinations were improved from the previous month. He described them as "mild."  He also

reported that his paranoia was less intense and he was sleeping better. Clark stated he had smoked

marijuana two weeks before. He had a GAF score of 43. (Tr. 466, 475, 481-482, 489-490).

Clark was hospitalized at St. Joseph Medical Center from April 8, 2011 through April 11,

2011. (Tr. 399-417, 419-446). On admission, Clark reported that he had been angry and depressed

and suicidal. (Tr. 399). He reported audio and visual hallucinations of his stepfather who had

physically and sexually molested Clark as a child. Clark's urine drug screen was positive for opiates

and cannabis. On admission, Clark had a GAF score of 25. The intake note states in pertinent part:

> He is alert, awake, oriented x4, person, place, time, situation. His speech is a normal
> rate and volume, spontaneous. His mood is depressed. His affect is constricted. His
> thought process is linear, it is goal directed. His thought content is currently negative
> for suicidal ideation, negative for homicidal ideation, and positive for some very low
> auditory hallucinations. His memory is fair. Concentration is fair. Abstraction fair.
> Fund of knowledge is fair. Insight is poor, and judgment is poor was well.

His attending physician, Dr. Soran Hong, noted Clark had been attending group sessions, was

smiling and interacting with staff, and taking his medications. Dr. Hong noted that while Clark's

schizoaffective disorder, bipolar type was well controlled, it could change due to "stressors"such as

a fight with his girlfriend, not taking his medications or taking drugs  Dr. Hong wrote:

> Future stressors: on the way home, he could have an argument with his girlfriend or
> somehow decide to no longer take his medications or decide to do some drugs. All
> future stressors are things beyond my control. The best thing we can do it set up the
> patient with some follow up, as they can help him to deal with his future stressors.

Clark's GAF score on discharge was 47.  (Tr. 404-406, 419-421).

Clark also submitted a letter written by Marcel Bowen on October 5, 2011. The letter states

in pertinent part:

> My name is Marcel Bowen. I am writing this letter on behalf of Bryan Clark. I have
> know Bryan and his family for over three years. I am the godmother of both his
> daughter, Kierstin, who is a special needs child, and his son Robert, who is three
> years old.

Earlier this year Bryan and his two children were in need of a place to live and were unable to obtain an apartment by themselves. As I was close to Bryan's two children, I agreed to help them by allowing them to live with me in a two-bedroom apartment. They have lived with me for the past 6 months. Bryan lives in one room and the two children share my room with me.

Basically, I am the caretaker to Bryan and his two children. I say caretaker, because Bryan is unable to care for his children or himself. I monitor his condition, his medications, his doctors' appointments and any other medical needs. I drive him to all of his appointments. He never leaves the apartment by himself, as he [is] afraid to do so; he only leaves when I tell him he must do so to attend an appointment. Also, I take care of all the family and household needs, such as taking Kierstin to school and taking full-time care of Robert. I do all  of the cleaning, cooking, and washing.

Bryan spends the majority of his day in his room. He rarely leaves the room, unless I make him do so. He takes 12 pills a day that I have divided into a pill organizer. I wake him in the morning and given him Celexa 40 mg and Benzatropin, 2 mg, at noon he takes 200 mg Seroquel and a second Benzatropin, in the evening 400 mg more of Seroquel and at night he takes 800 mg Seroquel and 2000 mg of Depokote. The Celexa is for depression, the Benzatropin is for side effects, but a side effect of that is heat stroke and when Bryan goes out into the heat, he does occasionally get light headed. The doctor said that is possibly from his medication. The Seroquel is for his Schizoafective disorder and for his bi-polar condition; it also assists with the paranoia and agitation. He takes a total of 1400 mg of this medication in a day. The medication was recently increased after I caught Bryan talking to people that weren't there. When I asked him whom he was talking to, he said he was talking to his friend. I told him there was no one there; he told me that everyone has friends in their head that they can talk to. I told him that this was not normal–he disagreed. During the day that happened and the day after, his agitation had increased considerably. When his agitation is up, it elevates quickly and can either go away quickly or take a couple of hours to go away. I also caught him playing with his lighter, lighting it over and over again. Bryan didn't mention hurting himself at that time, but he is a prior "cutter" and first attempted suicide at 8 years old. When Bryan was talking to people that were not there, and his agitation levels had increased, I called MHMR. The nurse I spoke to told me that, when we picked up his medications the next day, I should have Bryan talk to the nurse and she would talk to the doctor and see if the doctor needed to see him. When we went, we had to wait. Bryan became agitated and we left a message for the nurse to call me. When the nurse called, I explained to her what was going on; she called back and advised us to increase the Seroquel from 800 mg at night to 1200 mg at night. Bryan has untreated sleep apnea, when the medication was increased, Bryan would have episodes w here he would stop breathing completely. I called MHMR back, they advised to move the extra 400 mg of Seroquel to the evening and see if that corrects the problem. The problem got better, but was still occurring. The next week when Bryan went to see Dr. Eads, he moved the Benzatropin to earlier in the day to see if that would correct the problem of Bryan stopping breathing. It has

not corrected the problem completely. In addition to the sleep apnea and spells of stopping breathing completely, Bryan also has nightmares at night. He usually won't talk about the nightmares, but when he has talked about them in the past, they were often about his childhood abuse. When he was in St. Joseph's back in April, he was prescribed a medication for the nightmares,  Prazoslin 2 mg, however, MHMR advised they do not deal with nightmares and would not prescribe his medication for him. We are not able to afford that medication, so I just monitor the nightmares the best I can and try to calm him when they occur. At night we leave the television on high volume until his medications kick in, so [he] cannot hear voices.

The medications that Bryan takes have a depressant type effect on him. He is lethargic and doesn't want to leave his room. He is often drowsy and distant and has a hard time focusing. His attention levels are lower and his mental processing ability is diminished. He is easily distracted and his mind wanders. It is easy to determine when Bryan is medicated. I have to remind him and then make him take a shower and brush his teeth. Because the medication level is so high, that is one of the reasons that I live there. Bryan cannot be left alone with the children because I am concerned about his reaction time if something were to happen to the kids. The children are a very active three-year-old and a nine-year-old special needs child. Bryan's medications are so high, that I could not imagine him being able to work any job safely. But on the flip side of that, Bryan cannot be without any of these medications. Bryan does complain of back pain and has to move around and change position. When he does not change position, his back muscles appear to tighten up.

When he was living in his prior residence with his ex-girlfriend, she had questionable people who visited her on occasion at the residence. It is my understanding that those people brought drugs into the house. I did not know about the drugs at the time, but I do know that the people, who I've been told brought the drugs into the house, were not there often. I can also say for certain, that since Bryan and the kids have been living with me, there have been no drugs at our house and Bryan has not had any of the people from his past at the apartment. I was a 911 dispatcher for just short of 25 [years], and I will not allow any of those people or drugs or alcohol around my apartment, Bryan or the kids.  Both of my parents were alcoholics and I will not tolerate drugs or alcohol in my residence. Bryan did have one friend that I did allow to come around, but that person has moved to California with his job and will be assigned there for 2 [years]. Bryan has no other friends. His only visitor is his mother, who visits once a month.

I know that Bryan grew up in a drug environment, as his father was heavily involved in drugs. His father now is in prison due to his drug usage. I know that Bryan does not want to follow in his father's footsteps and realizes that staying free of drugs will create a better environment for his children. Likewise, he understands that he must maintain his medication regimen, despite the fact that the drugs make him lethargic and sensitive to heat and render him unable to care for his children independently. (Tr. 494-496).

Clark argues substantial evidence does not support the ALJ's determination that his psychiatric impairments were not disabling. He further argues that ALJ's RFC determination is not supported by substantial evidence because it overstates his abilities and is inconsistent with the record. According to Clark, he could not maintain and sustain full time competitive employment due to the severity psychiatric problems.  Clark points to Dr. Hirsch's evaluation along with the records from his hospitalizations and treatment records, documenting his low GAF scores which Clark argues demonstrate the he could not maintain and sustain full time competitive employment.  The Commissioner responds that the medical evidence does not support Clark's contention that he was disabled. The Commissioner counters that the ALJ did not minimize Clark's GAF scores but considered the scores in light of the totality of the record.  Moreover the Commissioner argues that substantial evidence supports the ALJ's observation that Clark improved when he took his medication as prescribed and most of his hospitalizations were due to alcohol, cannabis or cocaine abuse. According to the Commissioner, the ALJ's RFC determination took into account the nonexertional limitations supported by the record.

Here, substantial evidence supports the ALJ's finding that Clark's disorders of major depressive disorder, generalized anxiety disorder, schizoaffective disorder bipolar type, and polysubstance abuse were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment. The ALJ rated the degree of the functional limitation resulting from Clark's medically determinable mental impairments in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. The ALJ applied a five-point scale, rating the degree of limitation in the first three areas as either none, mild, moderate, marked, or extreme; and the limitation in the fourth area as either none, one, two or three, or four or more.  The ALJ determined

that Clark's mental impairments resulted in moderate limitations in each of the first three functional areas, and "no" limitations in the fourth area. This determination is consistent with the Psychiatric Review Technique completed by Dr. Meyer, based on her review of the medical records and her opinion that Clark was not a credible or believable source. None of the mental status examinations were accompanied by findings that Clark did not have the mental ability to perform basic work activities. As for Clark's argument relating to his low GAF scores, the GAF scores do not equate to any particular limitations on Clark's ability to perform basic work activities.[3] Here, the ALJ found Clark's impairments to be severe, considered the medical treatment notes and consulting examination by Dr. Hirsch, and included in Clark's RFC that he was restricted to work involving simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes and was limited to occasional interaction with supervisors, co-workers and the public.

Clark argues that substantial evidence does not support the ALJ's finding that his condition improved when not taking illegal substances or consuming alcohol. According to Clark, no treating physician made such a determination and Clark suggests the ALJ interpreted the medical records when he could have and should have relied on a medical expert. The Fifth Circuit in *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)*,* found the ALJ, as a layperson, should not interpret raw medical data in determining a claimant's RFC. Here, however, the ALJ did not make his own medical determination concerning the interplay between Clark's mental health and the role alcohol

---

[3] The Global Assessment of Functioning ("GAF") is a measurement "with respect only to psychological, social and occupational functioning." *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001)(citing *Diagnostic and Statistical Manual of Mental Disorders*, 4th edition (DSMIV), at 32). While a GAF score of 41-50 suggests "serious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)," *id.*, none of Clark's GAF scores were accompanied by any findings as to any social or occupational limitations.

and drugs of abuse played. The longitudinal records support the ALJ's finding that Clark's psychiatric conditions improved when he was not abusing cocaine or cannabis or alcohol. For example, Clark's hospitalizations on July 17, 2002, August 19, 2007 to August 22, 2007, March 2008, and January 9, 2009 were related to alcohol, cocaine or marijuana abuse. For example, when discharged on January 9, 2009, Clark was advised to quit abusing drugs. (Tr. 286). In addition, drugs along with a fight with his girl friend were identified by Dr. Hong as a "future stressor" when Clark was discharged in April 2011. That said, Dr. Hong noted Clark's condition improved and was controlled when on his prescribed medications.  Because Clark was not disabled under the listings at step three, the ALJ was not required to determine whether Clark's substance abuse was material to the disability determination. *See Brown v. Apfel*, 192 F.3d 492, 497-499 (5th Cir. 1999). Upon this record, the ALJ did not overstep his role and interpret medical data. He relied on the medical records in concluding that Clark's abuse of alcohol or cocaine exacerbated his mental impairment.

In addition, substantial evidence supports the ALJ's finding that Clark had the RFC to perform a full range of work at all exertional levels but with nonexertional limitations: Clark could carry out simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes. He is limited to occasional interaction with supervisors, co-workers and the public. Substantial evidence supports the ALJ's RFC determination.  The determination of a claimant's RFC is the sole responsibility of the ALJ. *See Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). Here, the ALJ properly interpreted the evidence to determine Clark's RFC and gave specific reasons in support of his RFC determination.

Substantial evidence supports the ALJ's determination that Clark had no exertional limitations. While Clark injured his hand in January 1999 (Tr. 211-212), was in a motor vehicle

accident in December 2002 (Tr. 200, 203-208, 215-218), his left thumb in August 2009 (Tr. 322-329), complained of back pain in April 2008 (Tr. 379-388) and knee pain in July 2008 (Tr. 374-376), there was no evidence of exertional limitations.

As for non-exterional limitations, substantial evidence supports the ALJ's determination that Clark could carry out simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes and limited to occasional interaction with supervisors, co-workers and the public. This was consistent with Dr. Meyer's Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. For instance, Dr. Meyer opined that Clark would be able to understand, remember and carry out detailed but non-complex instructions, make important decisions, attend and concentrate for extended periods, interact with others, accept instructions and respond to changes in work settings. (Tr. 318).   Upon this record, substantial evidence supports the ALJ's RFC assessment.   This factor weighs in favor of the ALJ's decision.

### B.  Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)).  The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists.  *Id.*   "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez,* 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social Security Ruling 96-2p provides:

[A] finding that a treating source medical opinion is not well supported by medically

> acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996).  With regard to the weight to be given "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion." *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d).  *Newton,* 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in administrative proceedings is not required.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately.  The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

Clark argues that the ALJ failed to consider and discuss with specificity the letter submitted by Marcel Bowen, Clark's daily care giver and did not specify the weight given to the letter. Clark argues that the letter is compelling and corroborates his allegations concerning the severity of his psychiatric impairments. The Commissioner responds that the ALJ  considered the letter. The

transcript from the September 28, 2011, hearing shows that the ALJ instructed Clark to send the written statement and stated that it would be considered. (Tr. 39). The letter is included in the record. (Tr. 494-496).  The ALJ's decision states the letter was received and considered. The Commissioner further argues the ALJ had no obligation to discuss every piece of information in the record and in this case, the contents of the letter was covered by Clark's testimony.  The law is clear that an ALJ is not required to reference everything in the record, and the failure to discuss each piece of evidence does not mean that it was not considered.  The ALJ is obligated to specify the evidence considered that supports his decision and also set forth why other evidence was rejected. Here, the ALJ stated that he received and considered the letter. Moreover, the substance of the letter corroborated Clark's testimony and in particular, the role of his care giver in the context of his day to day activities.

With respect to the ALJ's consideration of the opinion evidence, he wrote:

The claimant testified that he is disabled and unable to work because of schizophrenia, bipolar disorder, PTSD and depression. He stated that he was physically and sexually abused at a young age by his father. He reports symptoms of isolation, paranoia, auditory hallucination, agitation and difficulty interacting with others. He feels that his father follows him around and he is safer if he stays in his room. He experiences flashbacks and bad dreams. He is antisocial and has no friends. He gets nervous and he stays in his room most of the day. He has memory problems. He lives with his godmother and his two children. He does not do household chores and he does not socialize. He sleeps most of the day and watches television. His godmother cares for him and his children and she reminds him to take his medication. He stated that his medication helps but makes him fatigued. The claimant testified that he used illegal drugs in the past but not since taking medications.

Medical records from UTMB psychiatric unit dated August 19, 2007 revealed a history of depression and PTSD. The claimant had a recent increase in his depression with suicide thoughts. He was having flashbacks and nightmares due to abuse by his stepfather. He was abusing Xanax, cocaine and THC. He was not taking any medications and was binge drinking and smoking marijuana daily. He reported decreased sleep, decreased concentration and decreased interest in activities. A mental status examination revealed that he [was] interacting well with the hospital staff and his peers in the unit; his mood and affect was depressed; he exhibited auditory hallucinations; his memory, attention and concentration was normal; his

insight and judgment were normal. He has no psychotic symptoms or suicide thoughts; he was fully oriented; and his energy was appropriate. His medications included Celexa and Seroquel. The diagnosis was major depressive disorder recurrent, PTSD and polysubstance abuse (Exhibits 1F & 10F).

Emergency room medical record from Christus St. John Hospital documents treatment on March 3, 2008 for alcohol intoxication and depression (Exhibit 3F). Medical record from Mainland Medical Center emergency room dated January 9, 2009 documents treatment for cocaine abuse alcohol intoxication. The clinical impression was paranoia, cocaine, alcohol and marijuana abuse (Exhibit 4F).

Treating notes from Galveston 4Cs clinic dated June 7, 2008 revealed the claimant's medications included Buspar, Trazadone and Celexa controlled his symptoms such that he could return to work. His affect was happy. A note dated October 21, 2008 indicated that he was trying to get disability (Exhibit 2F).

A psychological evaluation performed by Victor Hirsch, Ph.D., a licensed psychologist, dated June 25, 2009 revealed a history of bipolar disorder and schizophrenia. The claimant reported taking Trazadone, Celexa and Buspar that helped his symptoms. He last drank three months ago and he denied using recreational drugs. He had poor sleep; he experienced sadness, suicide thoughts, hopelessness, and helplessness. He was unable to concentrate, got violent, not able to go outside or keep a job. He has anxiety, chest tightness, and sweaty palms. A mental status examination found him groomed, restless, and inattentive. He had poor memory and anxiety interfering with his concentration. He experienced visual hallucination, seeing his abusive father and auditory hallucination, voices telling him to hurt himself. He did not socialize with friends or interact with family. He did not attend church or shop for groceries. He had difficulty with people in authority. The diagnosis was major depression recurrent moderate, generalized anxiety disorder, R/O bipolar disorder and a global assessment of functioning score of 49 (Exhibit 5F).

Treating records from the Adult Psychiatric Center dated October 7, 2010 revealed the claimant's behavior was better when medicated (Exhibit 13F, page 5).

Progress notes from the Gulf Coast Center revealed on October 26, 2010 revealed blood screen positive for cannabis. A mental status examination showed he was well groomed, his affect and mood normal. A report on January 6, 2011 indicated he was still using marijuana and had not auditory hallucinations. His affect was appropriate and mood was normal. He reported occasional auditory hallucinations and he smoked marijuana two days ago. A report dated April 13, 2011 revealed his Celexa decreased his tension and he was sleeping well, he had no auditory hallucinations but had some paranoia. He was diagnosed with schizoaffective disorder bipolar type, personality disorder and cannabis abuse. (Exhibit 18F).

Medical records from St. Joseph Hospital dated April 8, 2011 through April 11, 2011

document an admission due to hallucinations and suicide behavior. A urinary drug screen was positive for cannabinoids and opiates. He had treatment with Celexa, Seroquel and Depakote and denied at discharge suicidal or homicidal thoughts or auditory hallucination. The diagnosis was schizoaffective disorder bipolar type, PTSD and a GAF 47 (Exhibit 16F & 17F). The claimant denied using drugs in his testimony. The medical evidence documents emergency room treatment for alcohol intoxification in March 2008 and January 2009. In addition, in January 2009 emergency room visit revealed use of cocaine and marijuana. He denied during a psychological evaluation in June 2009 that he was using recreational drugs; however, he had several drinks three months before. A treating note dated June 2008 indicated his medications controlled his symptoms and he could work again. A recent hospitalization in April 2011 revealed while admitted for auditory hallucination and suicide behavior a urinary drug screen was positive for cannabinoids and opiates. The medical record documents several ongoing treatments for drug abuse. A psychological examiner indicated the claimant's hallucinations were not verifiable. The medical record noted that the claimant's use of alcohol, cocaine and marijuana exacerbated his mental symptoms but when treated and was sober the symptoms improved. After treatment, his mental status examinations are essentially normal and his mental symptoms are mild to moderate. The medical record documents a long history of polysubstance abuse and when treated he becomes sober resulting in no significant functional limitations. The claimant's subjective complaints are not [consistent] with the objective medical evidence and therefore not credible.

The undersigned considered the State Agency psychological consultant's opinion and gives full weight to the assessment supported by the medical record (Exhibit 6F, page 3).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. (Tr. 12-14).

Here, the ALJ evaluated the physician opinions under the framework under § 404.1527(d). The undersigned Magistrate Judge finds that the ALJ's decision is a fair summary and characterization of the medical records. The ALJ thoroughly discussed the medical evidence and gave specific, detailed reasons for the weight given. The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C.  Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames,* 707 F.2d at 166.

Clark testified at the September 28, 2011, hearing. According to Clark, he is not able to work because he is afraid to go outside because he is paranoid that his stepfather is following him. (Tr. 27-28, 31). Clark testified that he hears voices and talks to the voices. (Tr. 28). Clark testified that he has no patience with people and has been told by others he has mood swings including by his care giver, Marcel Bowen. (Tr. 29). Clark testified that his medications made him feel fatigued and drowsy. He also testified that the medications help. (Tr. 31, 35).

Clark testified he could stand for twenty minutes, has no problems walking, sitting, climbing

stairs, stooping and crouching.  He testified he cannot lift anything heavy. (Tr. 31-33). Clark reported problems grasping with his right hand. (Tr. 34). Clark testified about problems he has with his memory ("I really can't remember nothing") and he has poor concentration. (Tr. 34-35). Because of his difficulties with concentration and memory, Clark testified he relies on Marcel Bowen, his caregiver. According to Clark, she also takes care of his two children, ages 9 and 3. One of Clark's children has special needs and receives disability.  Clark described Marcel Bowen as "the medicine police." (Tr. 35). Clark denied doing any work around the house. Clark testified that activities such as cooking, grocery shopping, washing dishes, driving are all taken care of by Marcel Bowen. (Tr. 36). According to Clark, he spends most of his time in his bedroom where he feels safe. Clark spends his time sleeping and watching television. (Tr. 37). Since he moved in with Marcel Bowen, Clark testified no longer has a problem with drugs or alcohol because drugs or alcohol are not allowed in her home and if he used either he would have to find another place to live. (Tr. 37-38).

Clark contends that the ALJ's credibility assessment is not supported by substantial evidence. Clark argues the ALJ failed to evaluate the side effects from the very strong medications he has been prescribed.  Clark contends the ALJ could have and should have questioned him about his side effects of his medication, dosages and if the medications were alleviating his symptoms. As to Clark's contention that the ALJ failed to consider his medications and side effects, while  the ALJ noted that the medications made Clark fatigued, he did not as argued by Clark specifically discuss any side effects, dosages, and whether the medications helped. The Fifth Circuit has held that the ALJ is required to consider the side effects of a claimant's medications and that failure to do so constitutes error. *Loza v. Apfel*, 219 F.3d 378, 397 (5th Cir. 2000); 20 C.F.R. 404.1529(c)(3)(iv), 416.929(c)(3)(iv). Even assuming that the ALJ erred by not considering the side effects of Clark's medications, such an error was harmless.  An error is harmless if it does not "[affect] the substantial

rights of a party" *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012), or when it is "inconceivable that the ALJ would have reached a different conclusion" absent the error. *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003); *Bornette v. Barnhart*, 466 F.Supp. 2d 811, 816 (E.D.Tex. 2006)("Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error." Here, aside from Clark's self described nature of the side effects (drowsiness or grogginess), there is no objective evidence in the record that Clark experienced any side effects that limited his ability to engage in basic work activities. Clark testified the medications helped him. In late May 2008, Clark told his health care provider that he knew he would do better if he took his medication. (Tr. 247, 396). The treatment note from June 7, 2008 (Tr. 246) reveals that Clark reported that the "meds have controlled him to the point that he can work again. Starts Wed at retail clothing store and is happy about it." (Tr. 246). Clark also reported to Dr. Hirsch that the "medications help sometimes." (Tr. 297). In October 2010, Clark reported that his behavior is better when he takes his medication and his "symptoms improve when he takes medication consistently." (Tr. 452). Absent in any medical record are complaints by Clark about side effects of his prescribed medications. Given the medical records along with the ALJ's determination that Clark's testimony was not wholly credible, it is unlikely a different decision would be reached had the ALJ discussed the side effects. The error associated with the ALJ's failure to discuss the alleged side effects of Clark's medication is harmless. *See e.g., Schmidt v. Comm. Social Sec.,* 465 Fed. Appx. 193,198-99, 2012 593276 *5 (3rd Cir. 2012) (failure of ALJ to discuss medication side effects was harmless where only evidence of side effects was claimant's own conclusory statements and claimant's statements were not consistent); *Rasmussen v. Astrue*, 254 Fed. Appx. 542, 547, 2007 WL 3326524 * 4 (7th Cir. 2007)(finding harmless ALJ's failure to discuss side effects of medication). The undersigned finds that there is nothing in the record to suggest that

the ALJ made improper credibility findings, or that he weighed the testimony improperly. Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Rosalind Y. Lloyd, a vocational expert ("VE"), at the hearing."A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  *Bowling,* 36 F.3d at  436.

The ALJ posed the following hypothetical questions to the VE:

Q. So let's go ahead and consider an individual same age, education, and work experience as the Claimant. Same individual would be, would have no exertional limitations, but nonexertionally would be limited to simple routine repetitive tasks

not performed in any fast paced production environment involving only simple work related decisions, and in general, relatively few work place changes. Would be further limited to only occasional interaction with supervisors, coworkers, and the general public. Would an individual with that description be able to engage in any competitive employment?

A. Yes, Your Honor.

Q. Are you able to give me three examples?

A. Yes, Your Honor. Office cleaner, DOT code 323.687-014, SVP: 2, local economy 2500, nation, 380,000. Parking lot attendant, DOT code 915.473-010, SVP: 2, 800 local economy, 190,000 nation. Mail clerk, non-postal, DOT code 209.687-026, SVP: 2, 1700 local economy, 285,000 nation.

Q. Would you brief, briefly summarize for me what's customarily expected by employers in terms of absences, routine rest break periods, as well as well as time on task expectations?

A. Your Honor, employers allow up to two absences per month in order for the employee to maintain employment. Breaks are two per day, one in the a.m., one in the p.m., 15 minute breaks. Employers expect employees to remain on task 80 percent of the time.

Q. And, of course, there's a, a 30 to 60 minute lunch break in the middle of those two breaks?

A. Right, right.

Q. Yeah, okay. Would it be fair for me to say then in summary that exceeding any of these customary limits on a regular basis would eliminate not only the jobs you were previously discussing, but ALJ competitive employment?

A. Yes, Your Honor. (Tr. 41-42).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert. A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Clark argues that ALJ erred by failing to include in his hypothetical question to the Vocational Expert limitations based on Clark's hallucinations, reclusiveness and side effects from his medications. The ALJ's hypothetical question included ALJ

limitations he found supported by the record. Dr. Hirsch noted in his consultative examination that while Clark complained about hallucinations, his complaints were not verifiable. Moreover, substantial evidence supports the ALJ's determination that Clark's hallucinations improved when taking his prescribed medications.  As to Clark's contention that the hypothetical should have addressed his reclusiveness, his RFC took into account his reclusiveness since Clark was limited him to occasional interactions with supervisors, co-workers and the public. As for his medication side effects, the record did not support his contention that he was precluded from work due to side effects from his medications.  Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Clark was not disabled.  Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Clark could perform work as an office cleaner, a parking lot attendant, and mail clerk, non-postal  because the above described jobs are consistent with his RFC.  The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Clark was not disabled within the meaning of the Act and therefore was not entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

**V.  Conclusion**

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Clark was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.  As such, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 11), is DENIED,

Defendant's Motion for Summary Judgment (Document No. 10) is GRANTED, and the decision of

the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 6th  day of November, 2013

Frances H. Stacy
United States Magistrate Judge